■ The People of the State of New York, Respondent, v Anthony V. Pavone, Appellant. [986 NYS2d 674]—

Egan Jr., J. Appeal from a judgment of the County Court of Clinton County (McGill, J.), rendered August 7, 2011, upon a verdict convicting defendant of the crimes of murder in the first degree (two counts) and criminal possession of a weapon in the second degree.

On Sunday, January 31, 2010 at 3:50 a.m., Patricia Howard placed a 911 call from Timothy Carter's residence—located on State Route 374 near Chazy Lake in the Town of Dannemora, Clinton County—advising State Police that defendant, her former boyfriend, was on the premises, had been "knocking on the door . . . for the last 20 minutes or so" and was refusing to leave. State Police dispatched two troopers to the scene and, shortly before the responding troopers arrived, one of Carter's neighbors, Floyd Guerin, called 911 to report hearing a series of "pops" coming from Carter's residence. Guerin further advised State Police that he saw an individual—carrying what "[l]ooked like a pistol"—leaving that location in a "[d]ark color GMC" truck and heading back toward Dannemora. Literally seconds

after this individual—later identified as defendant—left Carter's residence, the responding troopers arrived to find both Howard and Carter dead from gunshot wounds.

After returning to his residence to assemble a survival backpack, defendant left Clinton County and eventually checked into the Del Motel in the Town of Kirkwood, Broome County under a false name. At approximately 10:15 p.m. on February 4, 2010, a Broome County sheriff's deputy, who had been advised that defendant was wanted for questioning in connection with a double homicide in Clinton County, spotted a black 2001 GMC Sierra—registered to defendant—in the parking lot of the motel. Additional law enforcement personnel, including a hostage negotiator, were summoned and, approximately 2½ hours later, defendant surrendered to local authorities and thereafter was returned to Clinton County.

Defendant subsequently was indicted and charged with two counts of murder in the first degree, two counts of murder in the second degree and one count of criminal possession of a weapon in the second degree. At trial, defendant admitted that he killed Howard and Carter, but contended that he did so while acting under an extreme emotional disturbance. The jury rejected this affirmative defense and convicted defendant of two counts of murder in the first degree and the related weapons charge. County Court thereafter imposed concurrent prison terms of life without the possibility of parole for the murder convictions, in addition to a concurrent 10-year prison term for the weapons conviction. Defendant now appeals.

We affirm. Although we agree with defendant that the People violated his post-*Miranda* right to remain silent by, among other things, eliciting testimony on their case-in-chief regarding his failure to apprise the law enforcement officials who apprehended/transported him that he acted under an extreme emotional disturbance at the time of the shootings, defense counsel—with one exception—did not object to any of the challenged testimony or comments at trial, nor did he request any curative or limiting instructions with respect thereto. Accordingly, this issue is largely unpreserved for our review (*see* CPL 470.05 [2]; *cf. People v Fox*, 60 AD3d 966, 967 [2009], *lv denied* 12 NY3d 915 [2009]). To the extent that defendant now claims that counsel's performance was deficient in this regard, thereby compelling this Court to take corrective action in the interest of justice,[1] we disagree. In any event, contrary to the position adopted by the dissent, the admission of the challenged

_____

1. Defendant's emotional state was a key issue at trial and, while the challenged testimony indeed violated defendant's postarrest right to remain silent,

testimony was—for the reasons that follow—harmless in light of the overwhelming evidence establishing both defendant's guilt beyond a reasonable doubt and his corresponding failure to prove his affirmative defense of extreme emotional disturbance by a preponderance of the evidence.

In a prosecution for murder in the first degree, a defendant may assert the affirmative defense of extreme emotional disturbance (*see* Penal Law § 125.27 [1] [a] [viii]; [b]; [2] [a]), which, if successful, reduces the defendant's degree of criminal culpability to manslaughter in the first degree (*see People v Harris*, 95 NY2d 316, 318-319 [2000]). Notably, the defense "does not negate intent" (*People v Cass*, 18 NY3d 553, 561 [2012] [internal quotation marks and citation omitted]; *accord People v Sepe*, 111 AD3d 75, 86 [2013], *appeal dismissed* 22 NY3d 1126 [2014]; *see People v Moronta*, 96 AD3d 418, 419 [2012], *lv denied* 20 NY3d 987 [2012]) but, rather, "allows a defendant charged with the commission of acts which would otherwise constitute murder to demonstrate the existence of mitigating factors which indicate that, although . . . not free from responsibility for [the] crime, [defendant] ought to be punished less severely" (*People v Sepe*, 111 AD3d at 86 [internal quotation marks and citations omitted]; *see People v Harris*, 95 NY2d at 318-319; *People v Casassa*, 49 NY2d 668, 679-681 [1980], *cert denied* 449 US 842 [1980]; *People v Moronta*, 96 AD3d at 419).

As the Court of Appeals has instructed, the extreme emotional disturbance defense is comprised of both subjective and objective elements. "The subjective element focuses on the defendant's state of mind at the time of the crime and requires sufficient evidence that the defendant's conduct was actually

___

such testimony also established that defendant entertained thoughts of suicide in the days after he killed Howard and Carter (including during the course of the negotiations leading to his eventual surrender) and that he "broke down" more than once while being transported from Broome County to Clinton County. Indeed, defense counsel established through his cross-examination of State Police Investigator Scott Weightman that defendant was upset and seemingly suicidal following his apprehension and, further, that Weightman "had no reason to suspect that [defendant] was faking" his emotional state at that time. Through this same witness, defense counsel also was able to imply that defendant's failure to state that "he snapped or lost it" at the time of the killings stemmed from the fact that defendant admittedly was not questioned regarding the underlying crimes after he was given his *Miranda* warnings and, hence, was not afforded an opportunity to explain his emotional state. With the benefit of hindsight, reasonable minds arguably could differ as to the manner in which defense counsel approached such testimony. That said, counsel's tactical decision in this regard does not, to our analysis, constitute ineffective assistance of counsel, nor do we find the underlying error to be sufficient to warrant this Court's intervention under CPL 470.15 (3) (c) and (6).

influenced by an extreme emotional disturbance" (*People v Harris*, 95 NY2d at 319 [citations omitted]; *see People v Cass*, 18 NY3d at 561), i.e., "that the [defendant's] claimed explanation as to the cause of his [or her] action [was] not contrived or [a] sham" (*People v Casassa*, 49 NY2d at 679). This subjective element is "generally associated with a loss of self-control" (*People v Harris*, 95 NY2d at 319; *see People v Sepe*, 111 AD3d at 86). The objective element, in turn, "requires proof of a reasonable explanation or excuse for the emotional disturbance . . .

[, which] must be determined by viewing the subjective mental condition of the defendant and the external circumstances as the defendant perceived them to be at the time, however inaccurate that perception may have been, and assessing from that standpoint whether the explanation or excuse for [the] emotional disturbance was reasonable" (*People v Harris*, 95 NY2d at 319 [internal quotation marks and citations omitted]; *see People v Cass*, 18 NY3d at 561; *People v Casassa*, 49 NY2d at 679; *People v Sepe*, 111 AD3d at 86).

To be sure, the extreme emotional disturbance defense "is significantly broader in scope than the 'heat of passion' doctrine [that] it replaced" (*People v Casassa*, 49 NY2d at 676; *see People v Sepe*, 111 AD3d at 86) and, for that reason, the "[a]ction[s] influenced by [such defense] need not be spontaneous" (*People v Wells*, 101 AD3d 1250, 1252 [2012], *lv denied* 20 NY3d 1066 [2013]). " 'Rather, it may be that a significant mental trauma has affected a defendant's mind for a substantial period of time, simmering in the unknowing subconscious and then inexplicably coming to the fore' " (*People v Casassa*, 49 NY2d at 676, quoting *People v Patterson*, 39 NY2d 288, 303 [1976], *affd* 432 US 197 [1977]; *see People v Wells*, 101 AD3d at 1252). That said, evidence demonstrating a defendant's "high degree of self-control" (*People v Bonilla*, 57 AD3d 400, 401 [2008], *lv denied* 12 NY3d 814 [2009]; *see People v Mohamud*, 115 AD3d 1227, 1228 [2014]; *People v Moronta*, 96 AD3d at 420) or "the planned and deliberate character of the [underlying] attack" (*People v Acevedo*, 56 AD3d 341, 341 [2008], *lv denied* 12 NY3d 813 [2009]; *accord People v Moronta*, 96 AD3d at 420), as well as any "postcrime conduct . . . suggest[ing] . . . that [the defendant] was in full command of his [or her] faculties and had consciousness of guilt" (*People v Acevedo*, 56 AD3d at 341-342; *see People v Parra*, 58 AD3d 479, 480 [2009], *lv denied* 12 NY3d 820 [2009]), is entirely inconsistent with an extreme emotional disturbance defense.

At trial, there was no dispute that defendant killed Howard and Carter; indeed, defendant testified and readily admitted

that he did so. Rather, the question was whether there existed sufficient mitigating circumstances to demonstrate that defendant's conduct was deserving of some measure of leniency or mercy (*see People v Harris*, 95 NY2d at 318-319; *People v Casassa*, 49 NY2d at 680-681). On this point, the jury was presented with two conflicting expert opinions as to whether defendant suffered from an extreme emotional disturbance at the time of the killings and, further, whether—from his perspective—there was a reasonable explanation for his actions. Had those expert opinions been the *sole* basis upon which to evaluate defendant's affirmative defense, we would agree that this matter presented a "close case" relative thereto. However, there was extensive additional proof documenting defendant's statements and actions before, during and after the commission of the crimes, and it is defendant's own words and behaviors that—in our view—completely undermine his claimed defense.

The record reflects that at some point on Friday, January 29, 2010, defendant learned that Howard—his former girlfriend—was dating Carter. In response, defendant conducted an Internet search in order to obtain Carter's address and telephone number. Beginning that afternoon and continuing up until the early morning hours of Sunday, January 31, 2010, defendant left a series of increasingly belligerent and threatening phone messages for Howard and Carter—all of which reflect his repeated efforts to talk to Howard, ascertain her whereabouts and attempt to cajole her into returning to him. In addition to persistently calling Howard, defendant also—at some point during the evening of Saturday, January 30, 2010—drove to Howard's house and knocked on the door to see if she was home. When he received no answer, defendant drove to the residence occupied by Howard's daughter, hoping that he would find Howard there. When he failed to locate Howard at that address, defendant returned to his home, began calling Carter and resumed his attempts to reach Howard by telephone.

After leaving a final message on Carter's answering machine at 1:36 a.m. that Sunday,[2] defendant—armed with a .357 Smith and Wesson revolver—then drove to Carter's residence (a three-

---

**2.** Unless otherwise noted, all of these messages were left as voice mails on Howard's cell phone. A summary of the more pertinent voice mails follows. Friday, January 29, 2010 1:32 p.m. "Are you with him? Are you with him right now? Are you going to call me back? Call me back immediately." 1:34 p.m. "You gotta call me back." Saturday, January 30, 2010 (Howard's birthday) 10:05 a.m. "'I'm asking you for five minutes." 9:02 p.m. "I hope he didn't take you out on your birthday. Oh man. Somebody I knew called me and told me who this guy is." 9:16 p.m. "Alright, please give me a call. What's going on?" 9:54 p.m. "I know you're eating, but please give me a call before

unit dwelling) and began knocking on doors in an attempt to locate Howard and Carter. One resident, Wendall Davenport, testified that he awoke to a knock at his door at approximately 3:30 a.m. on Sunday, January 31, 2010. When he answered the door, a man—later identified as defendant—said that the "heat in [his] apartment [was] out" and asked where Carter lived. According to Davenport, who spoke with defendant for approximately three minutes, defendant was "polite" and "well aware." Another resident, Nicole Light, also testified that a man—again, later identified as defendant—knocked on her door around 3:30 a.m. and asked if Carter lived there. When Light informed defendant that Carter lived next door, defendant asked if Carter was at home. When Light indicated that she did not know whether Carter was home, defendant responded, "[W]ell, his truck's here so he must be home." According to Light, defendant, who apologized for waking her up in the middle of the

---

you leave. . . . [P]lease just call me before you leave the restaurant, OK?" 11:11 p.m. "I, I know you're out with [Carter]. Because . . . I called his house to see if he was home. . . . I had to try to find out if you were out with him because you told me you were going to be out with the girls. You lied to me." 11:27 p.m. "You don't know this guy. You're head over heels for him, but. . . I don't know what he's so special for." 11:50 p.m. "Ummm, the person who told me . . . who [Carter] is told me where he lives . . . told me quite a bit about him. . . . [I]f you guys don't have the courtesy to return my phone calls . . . I don't know if you're up at Chazy Lake [Carter's residence] or not, but I'll drive up there and I will wait and [I will] talk to him. I'm not upset with [Carter], . . . [b]ut somebody better give me a call. . . . If I don't get a call, I'm on my way to Chazy Lake." Sunday, January 31, 2010 12:02 a.m. (message on Carter's answering machine) "If you're any type of a man, you will return my phone call. . . . I will eventually talk to you . . . I will look for you, I will find you, I will go sit in front of your house in Chazy Lake if I gotta." 12:03 a.m. "I just called [Carter]. I left him a message. OK, it wasn't threatening . . . [b]ut one of you, if you're together, one of you has got to call me. . . . [T]his is wrong. . . . I'm not ready to give up on you yet. . . . Ah, but you know, if I gotta drive up to Chazy Lake. I don't wanna, you're probably not up there, but at least I'll meet him, because I'll sit there for three days if [that's what] it takes, you know I will. . . . God I hope you're not up at his house." 12:27 a.m. "I'm still pretty calm right now. But I'm, I'm getting really anxious because you're not returning my calls. And . . . it's . . . just gonna make it worse. . . . I'm still OK right now. . . . I don't really feel like driving up there, but if I gotta go and sit there, look I will. I know what his vehicle looks like." 12:48 a.m. "I've been driving around looking for you . . . I don't know if you're spending the weekend with him. . . . Come on, give me a break. Ah, I'm not going to go away. . . . I'm really starting to get frustrated tonight. . . . [Y]ou don't have to treat me like this." 1:36 a.m. (message on Carter's answering machine)"[Carter], I know you're getting these messages. I'm still looking for my girlfriend. I started out fairly calm, right now, I'm . . . starting to get a little frustrated. I know she's telling you not to call me, but she's also watching how you're handling this situation."

night, appeared "a little flustered" but overall "seemed pretty normal at that time."

Shortly after speaking with Davenport and Light, defendant knocked on the door to Carter's apartment and eventually spoke with Howard, who said, "[G]o home, we'll talk about it later." When defendant refused to leave, Howard placed her 911 call to the State Police at 3:50 a.m. At some point thereafter, defendant got into his truck and started to drive away. After driving approximately 200 feet, however, defendant turned around and returned to Carter's residence with the revolver.

Defendant again spoke with Howard and, in response to an alleged taunt from Howard and Carter's purported statement that he had a weapon, defendant pulled out his revolver and fired two shots through the glass window in the door. Defendant then reached through the window, unlocked the door and entered Carter's residence, firing four additional shots. Although the precise shooting sequence is unclear, Howard ultimately sustained two wounds—one to her chest followed by the fatal gunshot wound to her head. Although the pathologist was of the view that Howard most likely was standing when she sustained the chest wound, he testified that her fatal head injury was consistent with "somebody . . . in a down position[,] whether on their knees or bent over or some position where the head is down." Defendant, for his part, could not recall precisely how Howard sustained her fatal head wound, but he denied "purposely step[ping]" on her—despite a photograph contained in the record clearly depicting "pieces of glass . . . shaped in a footprint right at the center of [Howard's] back." As for Carter, the pathologist testified that Carter sustained a bullet wound to his left shoulder followed by the fatal wound to his right shoulder. Notably, the angle of trajectory and the fact that the second bullet did not fully exit Carter's body "suggest[ed that] he was shot while he was down on his left side." Six .357 shell casings were found in the living room of Carter's residence—five on a coffee table and one on the floor nearby.[3]

Following the shootings, defendant returned to his residence and, as noted previously, assembled a survival backpack—purportedly planning to walk to his father's residence—containing sufficient provisions to sustain "two or three or maybe four

_____

**3.** A sergeant with the State Police testified that the shell casings would remain in the revolver after firing; as a result, one would have to open the cylinder and manually eject the casings.

days [of] hiking."[4] Defendant, however, did not embark upon that trek; instead, he packed the loaded .357 revolver, removed the battery from his cell phone, secreted $400 in his underwear, drove to Broome County and checked into the Del Motel under a false name.

To our analysis, defendant systematically hunted down and then executed Howard and Carter, and the foregoing proof—consisting of defendant's own words and admitted actions leading up to, during and following the shootings—evidences a level of calculation, planning, calm deliberation and consciousness of guilt that is both entirely inconsistent with his claimed extreme emotional disturbance defense and completely undeserving of any leniency or mercy. Although the testimony offered by defendant's expert witness was, as County Court properly concluded, sufficient to submit the defense to the jury, the foregoing proof, coupled with Davenport's and Light's respective statements as to defendant's demeanor immediately prior to the shootings, overwhelmingly establishes both that defendant is guilty beyond a reasonable doubt and that he failed to prove his affirmative defense by a preponderance of the evidence (*see People v Parra*, 58 AD3d at 480; *cf. People v Mohamud*, 115 AD3d at 1228; *People v Moronta*, 96 AD3d at 420; *People v Acevedo*, 56 AD3d at 341-342), leading us to conclude that there is no reasonable possibility that the jury's verdict would have been different but for the admission of the challenged testimony. We therefore find that the error in this regard was harmless (*see People v Abare*, 86 AD3d 803, 804-805 [2011], *lv denied* 19 NY3d 861 [2012]; *People v Nelson*, 69 AD3d 762, 763 [2010], *lv denied* 15 NY3d 807 [2010]; *People v Romero*, 54 AD3d 781, 781 [2008], *lv denied* 11 NY3d 930 [2009]; *People v Loaiza*, 201 AD2d 587, 587-588 [1994], *lv denied* 83 NY2d 912 [1994]; *cf. People v Copp*, 107 AD3d 911, 912 [2013], *lv denied* 21 NY3d 1041 [2013]; *compare People v Theodore*, 113 AD3d 703, 704 [2014]; *People v McArthur*, 101 AD3d 752, 752-753 [2012], *lv denied* 20 NY3d 1101 [2013]; *People v Patterelli*, 68 AD3d 1151, 1154-1155 [2009]; *People v Stewart*, 20 AD3d 769, 770-771 [2005]). Defendant's remaining contentions, including the balance of his ineffective assistance of counsel claim, have been examined and found to be lacking in merit.

McCarthy, J.P., and Rose, J., concur.

Garry, J. (dissenting). I respectfully dissent. As the majority concedes, an error of constitutional dimension occurred during

---

**4.** In addition to the loaded revolver, the survival backpack included food, handwarmers, emergency blankets and toilet paper, as well as a poncho, flashlight, cell phone battery, ski mask, hat and folding knife.

this trial, when evidence of defendant's pretrial exercise of his right to remain silent was improperly used against him. The restriction against use of a defendant's silence is premised upon the fundamental unfairness that arises when the state implicitly assures an arrested person that silence will not be used against him or her and then reneges upon that promise (*see Doyle v Ohio*, 426 US 610, 618-619 [1976]; *People v Savage*, 50 NY2d 673, 677-678 [1980], *cert denied* 449 US 1016 [1980]). Whether a defendant's silence is used as part of the People's direct case, for impeachment purposes, or—as here—to challenge a defense, "[t]he implicit promise, the breach, and the consequent penalty are identical" and the unfairness is not altered (*Wainwright v Greenfield*, 474 US 284, 292 [1986]; *see People v Conyers*, 52 NY2d 454, 459 [1981]; *People v Stewart*, 20 AD3d 769, 770-771 [2005]; *People v Goldston*, 6 AD3d 736, 737-738 [2004]). As this was a constitutional violation, the test applied upon review is stringent: the error may be deemed harmless only if the evidence is so overwhelming that there is no reasonable possibility that the error affected the verdict (*see People v Patterelli*, 68 AD3d 1151, 1155 [2009]; *People v Murphy*, 51 AD3d 1057, 1058 [2008], *lv denied* 11 NY3d 792 [2008]; *People v Stewart*, 20 AD3d at 770-771). I cannot agree with the majority that this strict standard was satisfied.

The issue posed is not whether defendant shot and killed the two victims—that evidence is most clearly overwhelming. The sole issue before this Court involves the quantum of evidence disproving defendant's claim of extreme emotional disturbance—a defense that, notably, he was required to establish only by a preponderance of the evidence (*see* Penal Law § 25.00 [2]; *People v Patterson*, 39 NY2d 288, 301 [1976]). In this respect, defendant presented the expert testimony of a forensic psychiatrist who testified that, following a 2006 incident in which defendant was assaulted and injured while working as a prison guard, he suffered from post-traumatic stress disorder and major depressive disorder. This expert testified that defendant's career, financial security, and family and social networks broke down in the years following his injury; he was unable to return to work, required ongoing psychiatric treatment, suffered from fearfulness, paranoia and recurrent major depressive episodes, and his turbulent, on-again, off-again relationship with Patricia Howard became his "life line." In the weeks just before the shooting, that relationship, too, broke down, resulting in what the forensic psychiatrist described as accelerating distress and depression, as defendant's anxiety and forgetfulness worsened and his judgment and cognition deteriorated. Defendant's expert opined that the "frenetic" telephone calls to

Howard and Timothy Carter just before the shootings reflected increasing desperation and "anguish." According to the expert, by the time defendant confronted Howard at Carter's residence, he was psychologically and physically debilitated such that he felt that his life would end if he lost Howard; when she allegedly made a taunting remark about her relationship with Carter, defendant was overwhelmed and lost control. Given these forces, in the expert's professional opinion, defendant was suffering from extreme emotional disturbance when he shot the victims.

It was the jury's prerogative to reject this psychiatric opinion and to credit, instead, the contrary views of the People's expert. Were this case to be returned for trial, a jury might well reach the same conclusions set forth in the majority decision, finding that defendant's behavior arose from rational calculation rather than increasing desperation and loss of control. Nonetheless, however well founded such a conclusion may appear to be, the process of evaluating, interpreting and assigning weight to conflicting evidence is properly reserved to the jury; in light of the stringent standards governing our review, and upon this record, I do not find that the evidence before us permits a judicial determination. Our task on this appeal is not to engage in weighing the evidence, but is limited instead to determining whether the evidence controverting the extreme emotional disturbance defense is so overwhelming that there is no reasonable possibility that the constitutional error affected the jury's rejection of that defense (see People v Patterelli, 68 AD3d at 1154-1155). Here, for this Court to reach this conclusion as a matter of law—in effect, rejecting the opinion of defendant's expert as unworthy of belief—usurps the jury's prerogative to determine whether, in its discretion, the defense of extreme emotional disturbance is applicable (see People v Gabriel, 241 AD2d 835, 836 [1997], lv denied 91 NY2d 892 [1998]). Considering all of the evidence and, in particular, the conflicting expert opinions, I cannot conclude that the error of permitting the People to use defendant's postarrest silence to suggest that he had falsified his affirmative defense was harmless beyond a reasonable doubt (see People v Murphy, 51 AD3d at 1058; People v Stewart, 20 AD3d at 770-771; People v Gabriel, 241 AD2d at 836; see also People v Theodore, 113 AD3d 703, 704 [2014]; People v McArthur, 101 AD3d 752, 752-753 [2012], lv denied 20 NY3d 1101 [2013]). Accordingly, I would reverse defendant's murder convictions in the interest of justice and remit the matter for a new trial on those charges.

Ordered that the judgment is affirmed.